Curia, per
Evans, J.
The first ground in the traverse is, that the grant by the Legislature to Mrs. Wightman, of all the right, title and interest of the State of South Carolina, in the real estate of John Moore, is a bar to the process of escheat. By an Act of the Legislature, passed in December, 1824, it is enacted, “that all such property and estate as has heretofore not otherwise been disposed of, or may hereafter accrue to the State, in the district of Edge-field, by virtue of an Act entitled An Act to appoint escheators and to regulate escheats/ shall be, and the same is hereby, vested in the trustees of the Edgefield Village Academy, and the Society Academy, for the purpose of endowing and supporting the said Edgefield Academy and the Society Academy ; provided, the said sum arising from escheated property so appropriated shall not exceed the sum of ten thousand dollars.”
In England, (Sadler’s case, 4 Coke, 58,) on the death of one seized of land without heirs capable of taking by descent, the estate is thrown immediately on the King or the Lord of Escheat, who may take possession before office found. Whether this would be the case in this State, may be doubtful, because the State, not being a natural person like the King or Lord of Escheat, can do no act of itself, and has appointed no person to act for it in taking possession, otherwise than by the process of escheat, and the sale by the escheator, as directed by the Act of 1787. Until that is done, the right of the State may be inchoate; but when once established, it has relation back to the death of the last holder, so as to vest the property in the State at *531 his death; City Council vs. Lange, 1 Con. Rep. 454; but I am inclined to think, from the decision of this case, that it is wholly immaterial whether the title of the State at. the death of Moore, was perfect or inchoate. If it was perfect, then the grant to the acedemies became instantly a vested right. If it was inchoate when Moore died, it was equally so when the grant was made to Mrs. Wightman, by the Act of 1834; and the perfection of her title will depend on the establishment of the State’s title by the process of escheat, as much as the right of the academies ; for the grant to both is in nearly the same words, or in words equally comprehensive. If the Legislature had granted to the academies, by the Act of 1824, all the escheated property in Edgefield district, it would scarcely be contended that this grant could be defeated by a subsequent grant to Mrs. Wightman, and I am unable to discover any substantial difference between such a case and the one we are now considering. But it is unnecessary to discuss the power of the Legislature to defeat the grant of 1824, to the academies, because it is manifest that the Act of 1834, granting to Mrs. Wightman all the State’s right, title and interest in the estate of Moore, was not intended to interfere with the prior grant; for it is expressly provided “that nothing in this Act contained shall be construed in any manner to interfere with any right of the Edgefield Village Academy, under and by virtue of an Act passed in 1824,” &c. Nothing more was intended than to vest in Mrs. Wightman the estate of Moore, subject to the right of the prior grantees to have the $10,000 paid out of the sales of the estate, in pursuance of the Act of 1787 to appoint escheators and to regulate escheats. This makes both Acts consistent and in conformity with all the rules of construction and the obvious meaning of the Legislature. The construction contended for by the traversers, would make the Legislature guilty of a breach of good faith, and render the proviso in the Act of 1834 wholly inoperative and without meaning. On this ground, therefore, I am of opinion the traversers cannot succeed.
The grant to Mrs. Wightman is subject to the right of the academies to have Moore’s estate escheated, and so much of it sold as will satisfy their prior grant. But the *532 traversers contend further, that Mrs. Wightman, although an alien by birth, has become naturalized, so that she can take Moore’s estate by descent as next of kin, independent of the Act of 18-34. This naturalization, it is contended, has been effected in two ways; 1st. by taking the oath of allegiance, as the widow of McHarg, her first husband ; and, 2nd. by her marriage with Wightman, who, it is said, is a naturalized citizen. Let us now inquire if either of these two grounds can avail her. In relation to the first, it must be borne in mind that McHarg’s application to become a citizen, was made in 1819, and that he died without perfecting his naturalization in the life time of Moore. No step was taken by his widow, under the Act of Congress passed in 1804, until the term at which this issue was tried, so that she had not become a citizen under that Act when Moore died. By the Act of Congress of the 26th of March, 1804, “ when any alien, shall have complied with the first condition specified in the first section of the original Act, and who shall have pursued the directions prescribed in the -second section of the said Act, may die before he is actually naturalized, the widow and the children of such alien shall be considered as. citizens of the United States, and shall be entitled to all the rights and privileges of such, upon their taking the oaths prescribed by law.” The original Act here referred to, is the Act of the 14th April, 1802. The first condition mentioned in that Act is, that he shall have declared, on oath or affirmation, before some one of the courts mentioned in the Act, three years, at least, before his admission, “ that it was bona fide his intention to become a citizen of the United States, and to renounce forever all allegiance to any foreign state.” The second section contains this proviso, “ that in addition to the directions aforesaid, all free white persons, being aliens, who may arrive in the United States after the passing of this Act, shall, in order to become citizens of the United States,.make registry, and obtain certificates, in the following manner, viz: every person desirous of becoming naturalized, shall, if of the age of twenty-one, make, of himself, to the' clerk of some of the courts enumerated in the Act, and such report shall ascertain the name, birth-place, age, nation or allegiance of such alien, together with the *533 country whence he or she emigrated, and the place of his or her intended settlement.” To entitle the traverser, Mrs. Wightman, to become naturalized under the Act of 1804, as the widow of McHarg, he should have made the report of himself, required by the second section of the Act of 1802, and have complied with the first condition of the first section, by declaring on oath or affirmation that it was bona fide his intention to become a citizen of the United States, (fee.
The Act does not require that the report shall be made at a different time from the declaration of his intention to become a citizen, and it may be that the certificate of Me Harg is a compliance with the Act of 1802. I have not thought it necessary to examine this point fully, and to look into all the decisions which have been made, because I am satisfied it cannot avail the traversers, even if Me Harg had complied literally with those parts of the Act of 1802 which are required by the Act of 1804. I must here recur to the fact, that Mrs. Wightman had not consummated the allegiance which McHarg had began, at the death of Moore. Unless the disability of allegiance was removed in some other way, she was an alien at Moore’s death.
The effect of naturalization is to invest the alien with all the rights of natural born citizens, but it has no such retroactive operation as to make an alien capable of taking as heir of one who died before his naturalization. He who takes as heir, must take at the instant the last owner died. There can be no abeyance. The succession is cast on the next of kin who can take, passing by those nearest in blood, but who can not take on account of alienage or other disability. The heir must be capable of taking at the death of the last owner. There can be no restoration of the right of succession by removing the disability. There is a great difference between aliens claiming as purchasers and aliens claiming by descent. All the authorities agree that an alien may take by purchase. He may buy land, or it may be devised to him, and his title would be good against all the world except the Lord of Escheat. His title is good until office found, and it may be, that if in the meantime the alien becomes naturalized, this would bar the escheat. But no no such proposition has ever been contended in re *534 lation to an alien claiming as heir. Fairfax vs. Hunter, 7 Cranch; Vaux vs. Nesbit, 2 McCord Ch. Rep.; Minegwood vs. Pace, 1 Vlutris, 417.
But the traversers further contend, that Mrs. Wight-man’s residence in the United States, and her marriage with Wightman, a naturalized citizen, ipso facto made her a citizen, and capable of taking Moore’s estate by descent. In favor of the affirmative of this proposition, no authority has been cited, and I am inclined to think the negative has been considered indisputable. In Richards vs. McDaniel, 1 McCord, 187; 2 Ib. 351, the husband appears to have been a citizen; but the question whether that naturalized the wife, is not made; and I have no where seen the question proposed, as one to be discussed, except in Spratt vs. Spratt, 4 Peters, 408. It is said, in the statement of the case, that it is admitted the plaintiff was not naturalized, unless the naturalization of her husband make her a citizen. But the case turned on other grounds, and the question is not subsequently noticed, or discussed. It appears, from the facts stated in this case, that Wightman was naturalized before he married Mrs. McHa'rg, and this renders it unnecessary to discuss the question stated in Spratt vs. Spratt—whether, by the Acts of 1802 and 1804, taken together, the naturalization of the husband during coverture, does not enure to the benefit of the wife, as well as the children ; otherwise this strange absurdity might arise, if the husband began the process of naturalization under the Act of 1802, and died, his wife might become a citizen under the Act of 1804, by taking the oath of allegiance alone ; but if the husband actually became a citizen, and then died, his wife, to become a citizen, must begin de novo the process of naturalization, by making a report and taking all the oaths prescribed by the Act of 1802, although the children, who, by the Act of 1804, are put on the same footing with the wife, would have been made citizens by their father’s naturalization in his life time. But it is unnecessary to discuss the question, as it does not arise in the case. I would remark, however, that it is not the duty of the court to supply omissions of the Legislature, and as naturalization is a conferred right, he who claims it must be able to point out the law which gives it to him. Until he *535 can do so, his status in society remains as it was by nature. No case has been cited, and I have been unable to find any in my researches, where a wife has been allowed to take an estate by inheritance by virtue of citizenship imparted to her by marriage. But the question has often arisen in England, whether an alien wife could be endowed of her husband’s lands, and it has been as often decided that she could not, unless she had married with the King’s license. It is not contended the law on this subject is different here from the common law. There is no statutory provision on the subject. If she cannot be endowed in England, she cannot in this country. Dower is, in some respects, like inheritance, it is created by operation of law, and does not arise from the mere act of the party. The reason why such a wife cannot be endowed is,' that she owes allegiance to a foreign power, and none can hold lands who owe a foreign allegiance. The reason applies with equal, if not greater force, to cases of descents. In the New Nork case of Sutcliffe vs. Forgry, 1 Cowen, 97, it is conceded as clear law, that in England an alien wife- cannot be endowed of her husband’s lands. In that case the husband was naturalized during the coverture, but no foundation of right on her part is set up on that fact. Indeed all the cases go on the ground that the husband may be a citizen -and the wife an alien; for if his citizenship was imparted to her by the fact of marriage, the question whether she could be endowed of his land never could arise.
The fourth and fifth grounds of the traverse were not pressed at the argument, but as they were not abandoned, it will be necessary to notice them in this opinion. They are founded on the supposition that the case of the traverser, Mrs. Wightman, comes within the Act of our Legislature, passed in 1807. 1 Brev. 18. It is manifest from looking at that Act, that it was intended to provide for certain cases which had arisen before the passing of the Act, and not to enable aliens in general to take real estate by descent or purchase; and such was the decision of the case of McKellar vs. McKellar, decided in the Equity Court of Appeals, in the year 1820. I am therefore of opinion that none of the grounds of the traverse can avail.the traversers, *536 and that a new trial must be granted; and it is hereby ordered.
IN THE EQUITY COURT OF APPEALS — 1820.

McKellar vs. McKellar.

John McKellar, senior, was a naturalized citizen. His nephew, John McKellar, jun,. was also a naturalized citizen, and died in the life time of his uncle, leaving children, native citizens, who were the complainants. The defendants were the brothers of John McKellar-, sen., aliens, who, in his lifetime, removed to this State, and gave notice of their intention to become citizens, but had not completed their naturalization when he died, about 1818, intestate, without wife or children. On the part of the defendants, it was contended that under the Act of 1807, (5 Stat. at Large, 547,) the defendants were entitled, as next of lrin, to become the heirs of their deceased brother, by continuing their residence in the State and becoming citizens within as short a period as practicable.
Chancellor James held that the Act of 1807 was intended to embrace only cases then-existing, and-that the descent was cast upon the grand nephews, the only relations who were citizens, who were enabled to inherit by virtue of the statute of 11 & 12 William 3d (2 Stat. at Large, p. 214.)
The following is the opinion of the Court of Appeals in Equity.
The Act of 1807 does not apply to this case. It appears plainly from the preamble nnd from every clause of that Act, that the only object,was to provide for claims to lands then existing, and which were defective, either because they had been acquired by citizens from aliens, or had accrued to aliens of a particular description. The present claimants are not such aliens, and they can acquire no right under the Act, unless this is construed to be a new law of descent which has abolished in future the disability of alien-age. But such an intention is no where expressed in the Act, and it is not to be presumed that the Legislature would abolish a great rule of policy which reaches a part of the legal jurisprudence of every other country.
In tire case of Richa/rds vs. McDaniel, decided by the Constitutional Court, it does not appear that a different construction has been given to the Act. That case is evidently considered by the court as coming under the special provisions of it, and not under any general right conferred on aliens.
THOS. WATIES.
H. W. DeSAUSSURE,
Chancellors James and Gailliard concurred.
Chancellor Thompson at first dissented, but upon reflection concurred.
Gantt, Richardson and Earle, JJ., concurred.
Butler, J.
declined signing this opinion, being one of •the trustees of the Academy.